Miles Pope
Goddard Pope PLLC
967 E. Parkcenter Blvd. No. 1010
Boise, ID 83706
Tel: (208) 329-5671
Email: miles@goddard-pope.com

## UNITED STATES DISTRICT COURT
## FOR THE DISRICT OF IDAHO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Case No. 1:21-CR-158-DCN** |
| | ) | |
| **v.** | ) | **Sentence-Reduction Motion** |
| | ) | **under § 3582(c)(1)(A)** |
| | ) | |
| **LAURA DENISE RUSSELL** | ) | |

*The Federal Correctional Institute ("FCI") Dublin is a dysfunctional mess. The situation can no longer be tolerated. The facility is in dire need of immediate change. Given the record presented and the Court's personal observations, further magnified by recent events, the Court finds the Bureau of Prison ("BOP") has proceeded sluggishly and with intentional disregard of the inmates' constitutional rights despite being fully apprised of the situation for years.* Order Granting the Motion for Class Certification, *Cal. Coalition for Women Prisoners v. U.S.*, Case No. 4:23-cv-4155-YGR, ECF No. 222 at 1 (N.D. Cal. Mar. 15, 2024).

*Since her arrival to FMC Lexington (SCP), Mrs. Russell has demonstrated an above-average readiness for reentry into society. Mrs. Russell has developed an appropriate rapport with both staff and inmates alike; she has maintained clear conduct throughout her entire term of incarceration and is not considered a management concern; and she makes good use of her time by working, participating in a variety of programs (both of interest and recommended), and helping out around the unit where needed.* BOP Progress Report (Ex. S at 3).

## Introduction

Laura Russell is a victim of the extraordinary circumstances at FCI Dublin. She has been assaulted; she has been mis-medicated; she has been subjected to serious medical neglect; and she has had her statutory rights—and her dignity—violated by the federal Bureau of Prisons. Having suffered enough, she now moves for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A).

## Background

### A. The underlying criminal case

On June 22, 2023, following her guilty plea to money-laundering conspiracy, this Court sentenced Laura Russell to 40 months in prison followed by two years of supervised release (ECF No. 160).

Ms. Russell is a 66-year-old woman with no prior criminal record (PSR ¶ 44). When she was sentenced, the government itself recognized that Ms. Russell precarious health justified a downward variance—and her health has only deteriorated since then (*see* ECF No. 158 at 9-10). In its sentencing memorandum, the government also acknowledged that Ms. Russell played a minor role in the money-laundering conspiracy to which she pleaded guilty, and, in the final analysis, it agreed that § 3553(a) supported a sentence 4-levels below the guidelines range.

The Court ultimately imposed a 40-month sentence on Ms. Russell (*see* ECF No. 160). In recognition of Ms. Russell's unblemished criminal history, her advanced age, and her serious medical issues, the Court also permitted her to voluntarily

surrender and properly recommended that she serve her sentence in the minimum security facility at FCI Dublin—the closest appropriate federal prison facility to Ms. Russell's loving husband, Steve, and to her home (*see* ECF No. 160).

### B. Ms. Russell's experience in BOP custody

Before the September 9, 2023 deadline set by this Court, Ms. Russell self-surrendered to FCI Dublin's minimum security satellite camp. While she was at Dublin, she received recklessly deficient medical care and she was assaulted—and then retaliated against—by Yovanna Mangra, an FCI Dublin prison guard. Then—after the BOP precipitously closed FCI Dublin in response to a federal court order appointing a special master to oversee the facility—Ms. Russell was shipped from Dublin to FMC Lexington, thousands of miles from her family, and subjected to brutally degrading and literally bruising strip searches three times in 72 hours.

### 1. Starting from the moment of intake, Ms. Russell receives deficient medical care at FCI Dublin.

Ms. Russell arrived at FCI Dublin in worse medical shape than she had been in when the Court sentenced her. In June 2023, when the Court sentenced her, it was aware that she had a history of hypothyroidism and that she suffered from Meniere's disease, a relatively rare inner ear condition that causes tinnitus, vertigo, and otherwise causes a person to unexpectedly lose their balance (*see* PSR ¶ 51).

On August 2023—between when she was sentenced and when she arrived in BOP custody—Ms. Russell was also diagnosed with osteoporosis, a condition that weakens and brittles the bones, making them more likely to break (*see* Ex. A). For obvious reasons, osteoporosis magnifies the risks associated with Meniere's disease.

Meniere's disease increases the odds of a fall; osteoporosis increases the odds that a fall will lead to broken bones. *See infra* argument B.1.

During intake at FCI Dublin, Ms. Russell provided the facility's medical staff with two physicians' letters describing the minimum treatment she required for her diagnosed conditions. First, Ms. Russell's internist, Dr. Amy Schell, wrote to recommend that Ms. Russell see a specialist in osteoporosis. Dr. Schell also explained that Ms. Russell "should, *at the very least*, be treated with alendronate 70 mg weekly in addition to calcium and vitamin" (Ex. A (emphasis added)).

Second, Dr. Eric P. Wilkinson—the specialist Ms. Russell saw in connection with her Meniere's Disease—explained that she "takes Betahistine 16mg by mouth twice daily" for her Meniere's disease, and he "request[ed] that she be able to continue taking this medication as it is helping with the control of her disease and preventing vertigo and dizziness" (Ex. B).

FCI Dublin's medical staff followed neither doctor's recommendations. Instead of prescribing Betahistine—a preventative medication that stops Meniere's symptoms before they occur—FCI Dublin told Ms. Russell to treat her Meniere's disease with Meclazine (*See* Ex. C (Ms. Russell's request for compassionate release); Ex. D (14-day physical evaluation at FCI Dublin)). As Dr. Wilkinson explains, this is a patently deficient course of treatment. "Medicines such as meclizine or dimenhydrinate (Dramamine) do not treat the underlying condition of Meniere's Disease," and they are "not [an] adequate medical treatment of her Meniere's Disease" (Ex. E). That's because they do not treat the disease at all; "they only blunt

Sentence-Reduction Motion
– 3 –

the vestibular response when a patient is already having vertigo." (Ex. E). This means that, while Ms. Russell has been in BOP custody, she has had no ability to prevent the dizziness (and associated risk of falling) that Meniere's engenders (*see* Ex E). At the time of filing, Betahistine still has not been made available to Ms. Russell (*see* Ex. F (list of current medications)).

As for Ms. Russell's osteoporosis, while she was at FCI Dublin Ms. Russell was falsely told that there were no prescription medications for osteoporosis on the BOP's formulary. Dr. Fisch thus declined to prescribe any prescription medications to help Ms. Russell manage her osteoporosis, and she was reduced to relying on calcium and vitamin D (*see* Ex. D; Ex. F). Her osteoporosis remains mismanaged.

As the Court knows, Ms. Russell also suffers from hypothyroidism. When she self-surrendered, Ms. Russell was managing that condition by taking 90mg per day of NP Thyroid—a medicine prescribed by a nurse practitioner at an Idaho endocrinology clinic (Ex. G; *see* PSR ¶ 51). Unlike with the Meniere's and osteoporosis, Dublin's medical staff kept Ms. Russell on that medication and dose (*see* Ex. F). But they kept her on it for far too long. As early as February 2024, BOP records reflected that 90mg of NP Thyroid was failing to manage her condition (*see* Ex. P; Ex. G). But it was not until April 21, 2024—right as Ms. Russell was undergoing a medical examination in anticipation of FCI Dublin's sudden closure— that an out-of-institution doctor actually told Ms. Russell about her mismedication, and it was not until her 14-day review at FMC Lexington that a note was first made that she needed to see an endocrinologist (*see* Ex. G; Ex. N).

### 2. Prison assault

Beyond deficient medical care, Ms. Russell was also assaulted by a correctional officer while she was in FCI Dublin's custody. The assault happened at around 7:30 a.m. on October 4, 2023. Ms. Russell was leaning over the sink in her cell, brushing her teeth, when Dublin prison guard Yovanna Mangra aggressively shoved her cell door open, slamming it directly into Ms. Russell's right elbow (*see* Ex. C (Ms. Russell's report); Ex. H (Ms. Russell's cellmate's account)). Then she did it again—again slamming the door into Ms. Russell's right elbow (*id.*).

Two consequences have flowed from this assault. First, it has left Ms. Russell with a legacy of pain and other troubling symptoms that the BOP has not yet addressed (*see* Ex. G). Ever since Officer Mangra slammed the cell door into Ms. Russell's elbow, Ms. Russell has experienced intermittent swelling in her right hand; she experiences numbness in her right hand whenever she straightens out her elbow; and multiple medical personnel have observed evidence of nerve damage in her right arm and wrist (Ex. I; *see* Ex. N).

Second, Ms. Russell also experienced retaliation from Officer Mangra. Shortly after the assault, Ms. Russell submitted a grievance form in which she reported that Officer Mangra had assaulted her (Ex. J; Ex. K). A few weeks later—on November 20, 2024—Officer Mangra retaliated. She waited until the middle of the night, then walked up to Ms. Russell's cell, started pounding on its door, and flashed a flashlight into Ms. Russell's face (Ex. L; Ex. K).

Officer Mangra's assault on Ms. Russell and subsequent harassment is in keeping with FCI Dublin's "culture of retaliation and victim-blaming." *California Coalition for Women Prisoners, et al. v. U.S. Federal Bureau of Prisons, et al.*, No. 4:23-cv-04155, ECF Nos. 152 at 43 [this case will hereafter be referred to as the "Dublin Prison Case"]. That culture was cultivated by former warden Ray Garcia, who was convicted of sexually abusing female inmates over the course of three decades. (It's worth noting that, following Warden Garcia's criminal conviction, Officer Mangra opted to submit a declaration supporting him on the grounds that "female inmates engage in voluntarily inappropriate displays of their bodies and other sexual-type misconduct" (Ex. M).).

### 3. FCI Dublin's closure—and Ms. Russell's experiences in its wake.

#### a. The situation at Dublin

It is simultaneously extraordinary and sadly unsurprising that Ms. Russell has endured these specific experiences while incarcerated at Dublin. Starting about 3 years ago, a series of news reports uncovered a culture of rampant sexual abuse by correctional officers at FCI Dublin. Ever since those revelations, Dublin has been severely understaffed and has struggled to overcome a culture of retaliation against its women prisoners. *Dublin Prison Case*, No. 4:23-cv-04155, ECF No. 152 at 43.

In 2023, plaintiffs filed a class action complaint against the BOP and other defendants, alleging that the BOP was violating the constitutional rights of those incarcerated at FCI Dublin by subjecting them to a culture of sexual abuse, failing to provide adequate medical and mental health care, and violating their First

Amendment rights by retaliating against inmates who spoke out against prison conditions. *Dublin Prison Case*, No. 4:23-cv-04155, ECF Nos. 1 (complaint), 152 (amended complaint); *see id.* ECF No. 152 at 9 (alleging ongoing "pervasive culture of sexual misconduct and retaliation at FCI Dublin").

The specific allegations in this lawsuit echo Ms. Russell's experiences while in custody at FCI Dublin:

- Ms. Russell's medications for every one of her conditions—Meniere's, hypothyroidism, and osteoporosis—have been mismanaged, with the wrong medication given for Meniere's Disease, the wrong dosage of medication given for hypothyroidism, and no necessary prescription medication given for osteoporosis (Exs. A-C, F, G). She is not alone. *See Dublin Prison Case*, ECF No. 152 ¶ 219 ("When [plaintiff G.M.] arrived at FCI Dublin, she was taken off her blood-clotting medicine."); *id.* ¶ 221 ("Plaintiff L.T. . . . has been provided expired medication.").

- Ms. Russell has endured inexcusable delays and incompetent execution in connection with necessary medical procedures, such as FCI Dublin's failure to refer her to an osteoporosis specialist and the facility's having apparently switched the x-ray of her right elbow that followed Officer Mangra's assault on her with someone else's x-ray. She is, again, not alone. *See Dublin Prison Case*, ECF No. 152 ¶ 218 (Plaintiff R.B.'s [ultrasound order] . . . was accidentally written for the wrong breast. Without a physician at the facility, Dublin staff could not change the order, so they did the ultrasound on the wrong breast."); *id.* ¶ 219 ("Every time [plaintiff G.M.] goes to sick call, they have no record of her problems."); *id.* ¶ 220 ("Plaintiff A.H.R. . . . suffered a weeks-long respiratory illness that caused him to spit up blood and feel as though he could not breathe, but medical staff at FCI Dublin did nothing[.]").

- Ms. Russell has even experienced some of the troubling symptoms incarcerated individuals at FCI Dublin have endured due to exposure to dangerous levels of asbestos and black mold at the facility. *See Dublin Prison Case*, No. 4:23-cv-4155, ECF No. 190; *see also* Michael Balsamo & Michael R. Sisak, *Whistleblower complaints of mold, asbestos at Dublin prison under scrutiny for sex abuses* (Apr. 9, 2022) (noting finding by U.S. Office of Special Counsel that BOP improperly failed to address Dublin asbestos and mold).

On March 15, 2024, District Judge Gonzalez Rogers granted class certification in this lawsuit. *See Dublin Prison Case*, No. 4:23-cv-04155, ECF No. 222 at 2. Finding FCI Dublin was a "dysfunctional mess," the court ordered appointment of a special master to oversee the facility. *See id.* The court found a "significant lack of health services and severe understaffing" at FCI Dublin. *Id.* at 10; *see also Dublin Prison Case*, No 4:23-cv-04155, ECF No. 300 at 5 ("FCI Dublin has repeatedly failed to follow BOP departmental policy related to completing timely health intakes; sick call access was delayed for extended periods; medical needs, including relative to communicable diseases, went untreated or lacked any follow up; and specialty appointments were not timely scheduled").

The court also noted the culture of retaliation at Dublin, observing that "inmates repeatedly reported that they are often threatened with the SHU for making any kind of report, whether for malfeasance like sexual abuse or enforcement of their rights, such as filing a medical complaint." *Id.*

### b. The BOP's precipitous and unilateral decision to close FCI Dublin

On April 5, 2024, the special master to oversee FCI Dublin was identified and appointed. *See Dublin Prison Case*, No. 4:23-cv-04155, ECF No. 248. Within ten days of this appointment, the BOP precipitously announced that the prison would close. *See* Lisa Fernandez, *Buses seen transferring women from FCI Dublin prison ahead of shutdown* (Apr. 17, 2024), https://www.ktvu.com/news/buses-seen-transferring-women-from-fci-dublin-prison-ahead-of-shutdown ("The news came as a surprise to

the women, their families and U.S. District Court Judge Yvonne Gonzalez Rogers who named a special master to oversee reforms over the prison on April 5.").

The special master, who was on site when the BOP began closing the prison, notified the court of "myriad concerns regarding, among others, the medical clearance process for the AICs [adults in custody] being prepared for transport and the eligibility of such individuals for community placement (i.e., home confinement, halfway homes) or release." *Dublin Prison Case*, No. 4:23-cv-04155, ECF No. 248.  In response, the court issued a series of orders under seal and asked that every inmate at Dublin be evaluated for home confinement or compassionate release. The BOP argued that the judge did not have authority to make this order, and inmate transfers resumed with buses leaving the prison on April 17, 2024.

Inmates were mistreated during these transfers, so much so that numerous Senators on the Judiciary Committee wrote to the BOP expressing deep alarm about "chaos" in connection with the transport, including "unavailability of medical staff; inadequate-to-no-medical attention, including for individuals expressing suicidal ideation; improper medical clearance prior to transport; lack of food and water for those remaining in the facility awaiting transfer; mistreatment, harassment, neglect, and abuse while in transit; and confiscation of personal property." Sens. Booker, Durbin, et al., *Letter to BOP re: FCI Dublin* (Apr. 24, 2024), https://www.booker.senate.gov/imo/media/doc/letter_to_bop_fci_dublin.pdf.

### c.  Ms. Russell's experience during transport

Ms. Russell was among those transported from Dublin after the BOP's decision to close the facility. Despite the First Step Act's requirement that the BOP house prisoners "as close as practicable to the prisoner's primary residence, and to the extent practicable, at a facility within 500 driving miles of that residence," Ms. Russell was transferred to FMC Lexington, which is 1,900 miles away from her primary residence and her deeply supportive husband.

Ms. Russell's transport—her first experience with prison transport—began on Monday, April 22, 2024 (Ex. N). The day she left Dublin, Ms. Russell was taken from the camp to the medium-security FCI, strip searched, put in shackles, and placed on a bus from Dublin to the private CoreCivic facility in Pahrump, Nevada, which the U.S. Marshals use as a transport hub (Ex. N). Ms. Russell remained in shackles, including when she had to go to the bathroom in the open port-a-potty in the back of the prison bus, for the full eight-hour trip (Ex. N).

Ms. Russell arrived at Pahrump sometime around midnight on Monday (Ex. N). She was again strip searched. She was then placed in a small holding cell with many other transports from Dublin where some people tried to eat while others in the same room were required to provide urine samples (Ex. N).

Ms. Russell was housed at Pahrump until Thursday, April 25. On Thursday, she and approximately 130 other women were brought back to the intake / outtake portion of the Pahrump facility. Ms. Russell was again strip searched, this time by a private guard from Trans Comm America who conducted the strip search—her third in under three days—in public view (Ex. N).

She was then placed in a holding cell. At 4:00 a.m. on Friday, she was handcuffed and placed on a bus. The bus took her to the Las Vegas Airport, where she was placed on an airplane in handcuffs so tight that bruising was noted on her medical report when she arrived at FMC Lexington (Ex. N *see also* Ex. I). She was flown to Atlanta, Georgia, placed on a stultifying bus to Lexington, and finally arrived at FMC Lexington around 2:00 a.m. on Saturday, April 27 (Ex. N).

Ms. Russell's degrading and painful experience during her transport from Dublin to Lexington is unsurprising given Judge Gonzalez Rogers's finding that "[a]lthough it had as much time as needed to prepare, BOP's operational plan for closure of FCI Dublin was ill-conceived and, like Swiss cheese, full of holes." *Dublin Prison Case*, 4:23-cv-4155, ECF No. 300 at 1.

\*     \*     \*

As Dubin was being closed, twenty-one inmates submitted § 3582(c)(1)(A) sentence-reduction motions to Judge Gonzalez Rogers. *See Dublin Prison Case*, 4:23-cv-4155, ECF No. 300 at 7. Because she was not the sentencing judge, Judge Gonzalez Rogers denied these motions without prejudice. But she also penned and docketed a letter to sentencing judges considering § 3582(c)(1)(A) applications from previously sentenced individuals who had been incarcerated at FCI Dublin. *See Dublin Prison Case*, 4:23-cv-4155, ECF No. 301-3 (Ex. O). In that letter, Judge Gonzalez Rogers notes that the population at FCI Dublin had "limited to no access to constitutionally adequate medical and mental health care, programming, and timely administrative relief" and that "[m]any [individuals incarcerated at FCI Dublin] have

been the subject of staff sexual abuse, harassment, and retaliation by staff seeking to cover up their own misconduct." *See id.* She also states her belief that "the time at FCI Dublin was likely 'harder time' than other institutions." *Id.* She offered this summary because of her expectation that many of those incarcerated at FCI Dublin would be submitting § 3582(c)(1)(A) motions "asking for leniency given the abuses they may have endured." *Id.*

Ms. Russell is one of those individuals. She now moves to have her sentence reduced under 18 U.S.C. § 3582(c)(1)(A).

## Statutory and Regulatory Framework

18 U.S.C. section 3582(c)(1)(A) authorizes district courts to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i). The statute directs courts to consider two issues in deciding whether to reduce a sentence: 1) whether "extraordinary and compelling reasons warrant [a sentence] reduction" and 2) "the factors set forth in section 3553(a) to the extent that they are applicable." *Id.* A sentence reduction based on extraordinary and compelling reasons must also be consistent with the Sentencing Commission's policy statement in USSG § 1B1.13. *See id.* § 3582(c)(1)(A). Recently, the Commission amended—and expanded—§ 1B1.13.

Three provisions of the amended policy statement are relevant to Ms. Russell's case. First, USSG § 1B1.13 now provides that an individual presents extraordinary and compelling reasons if they are suffering from "a medical condition that requires long-term or specialized medical care that is not being provided and without which

the defendant is at risk of serious deterioration in health or death." USSG § 1B1.13(b)(1)(C).

Second, it provides that "physical abuse resulting in serious bodily injury"— i.e., injury which causes "extreme physical pain or the protracted impairment of a function of a bodily member . . . or requir[es] medical intervention such as surgery, hospitalization, or physical rehabilitation"—constitutes extraordinary and compelling reasons if the abuse occurs while in custody. *Id.* § 1B1.13(b)(4)(B).

Finally, it sets forth a "catchall" provision under which a defendant presents extraordinary and compelling reasons if they "present[] any other circumstance or combination of circumstances that when considered by themselves or together with any of the reasons described in paragraphs (1) through (4) are similar in gravity to those described in paragraphs (1) through (4)." *Id.* § 1B1.13(b)(5).

The expanded policy statement, including the catchall provision, is intended to incorporate the range of extraordinary and compelling reasons that courts have for years relied on in the absence of a binding policy statement. U.S. Sent'g Comm'n, *Amendments to the Sentencing Guidelines* at 3, 5 (Apr. 27, 2023). That's because "judges are in a unique position to determine whether the circumstances warrant a reduction." *Id.* at 5 (internal quote marks omitted).

Once a defendant establishes extraordinary and compelling reasons for a sentence reduction, the Court must turn to the second statutory prong—analysis of the § 3553(a) factors. This prong requires the Court to consider the defendant's history and characteristics and the need for the sentence to provide punishment,

deterrence, public protection, and provide access to "medical care[] or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). In considering these factors, the Court has "broad discretion to consider all relevant information," including post-sentencing factual developments. *Concepcion v. U.S.*, 142 S. Ct. 2389, 2398 (2022). This analysis centers on whether the reduced sentence is "sufficient, but not greater than necessary" to achieve § 3553(a)'s goals.

## Argument

### A. This motion is ripe for the Court's review.

A court may consider a § 3582(c)(1)(A) motion provided that at least 30 days have elapsed since the warden received the compassionate release request. Ms. Russell has asked for compassionate release repeatedly, most recently on December 11, 2023 (Ex. C). Because 30 days have passed, this case is ripe for review.

### B. Ms. Russell presents extraordinary and compelling reasons for a sentence reduction.

Consistent with § 1B1.13, Ms. Russell presents circumstances that establish extraordinary and compelling reasons to reduce her sentence to time served.

#### 1. Ms. Russell's medical circumstances support reducing her sentence to credit for time served (USSG § 1B1.13(b)(1)(C)).

*First*, Ms. Russell presents extraordinary and compelling reasons for a sentence reduction because she "is suffering from a medical condition that requires

long-term or specialized medical care that is not being provided and without which

[she] is at risk of serious deterioration in health or death." USSG § 1B1.13(b)(1)(C).

Neither Ms. Russell's Meniere's disease nor her osteoporosis is being properly

managed by the BOP. Ms. Russell has not received necessary prescription medication

for her osteoporosis (*compare* Ex. F (BOP prescription records), *with* Ex. A (Dr. Schell

letter)). And her Meniere's is similarly mismanaged. As Dr. Wilkinson attests, proper

management of Meniere's Disease requires the BOP to allow Ms. Russell to take

Betahistine—a medication that prevents Meniere's symptoms (Ex. B). The BOP has

not prescribed Betahistine (Ex. F). Instead, it has prescribed Meclazine—a

medication that can only help mitigate the effects of Meniere's symptoms once they

occur, and that therefore "puts [Ms. Russell] at elevated risk of vertigo episodes that

could result in falls and further injuries" (Ex. E).

As Dr. Wilkinson explains, this deficient care puts Ms. Russell at risk of

serious deterioration in her health. Meniere's symptoms include vertigo, "a sensation

of feeling off balance" or "feel[ing] like you are spinning or that the world around you

is spinning." Geri K. Metzger, *Vertigo*, WebMD,

https://www.webmd.com/brain/vertigo-symptoms-causes-treatment; *see also* ECF No.

158 at 9 (government's acknowledgment that Ms. Russell experiences "persistent

vertigo")). Vertigo in turn increases Ms. Russell's risk of a fall. *See* Mayo Clinic,

*Dizziness*, https://www.mayoclinic.org/diseases-conditions/dizziness/symptoms-

causes/syc-20371787 ("Dizziness can increase your risk of falling and injuring

yourself."). And an increased risk of falling is particularly serious for a person, like

Ms. Russell, who has osteoporosis. *See* Michael P. Jeremiah, M.D., et al., *Diagnosis and Management of Osteoporosis*, 92(4) Am. Fam. Physician 261-268 (2015), https://www.aafp.org/pubs/afp/issues/2015/0815/p261.html ("Fall prevention is a priority for patients with osteoporosis because falls are more closely associated with fracture risk."). The BOP's failure to properly manage and medicate Ms. Russell's osteoporosis only compounds these risks.

Ms. Russell's mismanaged medical conditions presents extraordinary and compelling reasons for a sentence reduction under USSG § 1B1.13(b)(1)(C).

**2. Ms. Russell establishes extraordinary and compelling reasons for a sentence reduction to time served based on the physical abuse she endured at the hands of an FCI Dublin correctional officer (USSG § 1B1.13(b)(4)(B)).**

*Second*, the physical abuse and retaliation Ms. Russell endured at FCI Dublin at the hands of Correctional Officer Mangra establishes extraordinary and compelling reasons to reduce her sentence to time served. On October 4, 2023, Officer Mangra slammed a prison door against Ms. Russell—a 66-year-old osteoporotic woman—twice and in quick succession (Ex. C; Ex. H; Ex. J; Ex. L).

As the BOP's own medical records reflect, that assault has caused Ms. Russell serious bodily injury as the Sentencing Guidelines define that term. *See* USSG § 1B1.1 application note 1(M). She has experienced, continuing to the present day, protracted right-arm swelling and numbness as a result of that assault (Ex. G; Ex. I). Two medical professionals have observed evidence of Ulnar nerve damage (Ex. I; Ex. Q; Ex. R). And due to the egregious medical mismanagement at FCI Dublin—which

resulted in FCI Dublin medical attaching the wrong x-ray to Ms. Russell's medical file—she still hasn't received any specialist care or diagnosis of whatever damage Officer Mangra caused (*see* Ex. G (noting erroneous x-ray)).

Officer Mangra's retaliatory conduct against Ms. Russell—where, in response to the administrative complaint Ms. Russell filed, Officer Mangra harassed and intimidated her in the middle of the night—only underscores the appropriateness of reducing Ms. Russell's sentence to time served due to the assault Ms. Russell endured, and the serious bodily injury she has experienced as a result (*see* Ex. L).

> **3. Ms. Russell's overall experiences in connection with the singularly traumatic and dysfunctional circumstances at FCI Dublin—and the BOP's precipitous decision to close that facility—establish extraordinary and compelling reasons to reduce her sentence to time served (USSG § 1B1.13(b)(5)).**

*Finally*, Ms. Russell presents extraordinary and compelling reasons for a sentence reduction under USSG § 1B1.13(b)(5)'s catchall clause. Ms. Russell is a 66-year-old woman who, before self-surrendering to Dublin, had never spent a day in prison in her life. She should have served her sentence in a safe, minimum-security facility close to her loving husband.

She hasn't. Instead, Ms. Russell arrived at Dublin to experience serial mismanagement of her medical situation. She was assaulted and retaliated against by prison staff. She endured horrific environmental conditions at the prison facility. And then—right after Judge Gonzalez Rogers appointed a special master to actually make things better at FCI Dublin—she was hastily transferred out of that facility to a prison nearly 2,000 miles away from her home, in blatant violation of the statutory

directive that the BOP should house prisoners "as close as practicable to the prisoner's primary residence." 18 U.S.C. § 3621(b).

Ms. Russell's transport from Dublin to Lexington was brutally harsh and degrading. Ms. Russell was repeatedly and roughly strip searched. She was shackled—tight enough to cause noticeable bruising—at every phase of her transportation (Ex. N; Ex. I). And she was subject to degrading, overcrowded, and unsanitary conditions (e.g., being fed in the same small holding cell while others had to produce urine samples). This all happened—not because of anything Ms. Russell did to deserve it—but because of the BOP's shocking disregard for human wellbeing in favor of hastily shuttering Dublin to avoid judicial oversight and accountability. *See Dublin Prison Case*, 4:23-cv-4155, ECF No. 300 at 1.

These circumstances in combination amount to extraordinary and compelling reasons to reduce Ms. Russell's sentence to time served.

## C. The § 3553(a) factors support reducing Ms. Russell's sentence to time served.

Once this Court finds that extraordinary and compelling reasons exist for a sentence reduction, it must then consider whether that reduction is warranted under § 3553(a). In making this assessment, the Court must consider "the most up-to-date picture" of the defendant's history and characteristics. *Pepper v. U.S.*, 562 U.S. 476, 492 (2011). Even in sentence-reduction proceedings, it remains "critical" that the Court adhere to the parsimony principle and impose the most lenient sentence that

is "sufficient, but not greater than necessary," to serve the purposes of sentencing. *U.S. v. Lizarraras-Chacon*, 14 F.4th 961, 967 (9th Cir. 2021).

After applying all credits she has earned, Ms. Russell is projected to be released in February 2025—about 10 months from now (Ex. S). Reducing Ms. Russell's sentence to time served is thus a modest reduction in her sentence abundantly justified by the "the most up-to-date picture" of her history and characteristics.

*First*, the need to provide necessary treatment powerfully supports transferring Ms. Russell out of BOP custody. The BOP's mismanagement of Ms. Russell's Meniere's disease—combined with its mismanagement of her osteoporosis—poses an unacceptable risk of serious injury. By contrast, Ms. Russell has a team of medical providers in Idaho who understand her medical history and will move quickly to stabilize and properly treat her. These considerations argue strongly for reducing her sentence to time served so that she can obtain appropriate medical care in the only setting where she can access it— the community.

*Second*, with respect to the punitive aim of sentencing, Ms. Russell's time in custody has been orders of magnitude harsher than what the Court contemplated at sentencing. *See U.S. v. Scully*, 529 F. Supp. 3d 1190, 1193 (D. Or. 2021) (reducing sentence in part because "the sentence . . . served has undoubtedly been harsher than the one originally contemplated at the time of sentencing" (citation omitted)); *U.S. v. Chivira*, 2023 WL 3612389, at *2 (S.D. Cal. May 23, 2023) (granting sentence reduction on basis of abuse at FCI Dublin). When the Court sentenced Ms. Russell, it

did not intend that she would be assaulted by prison staff, retaliated against for speaking up, have her medications mismanaged, and be subjected to a degrading transport from FCI Dublin to a facility nearly two thousand miles away from her home. Ms. Russell's time at FCI Dublin was "hard[] time." *Dublin Prison Case*, No. 4:23-cv-4155-YGR, ECF No. 301-3. Allowing Ms. Russell to be released approximately ten months before she would otherwise be transferred to community corrections is consistent with just punishment.

*Finally*, releasing Ms. Russell poses no danger to the community. Before this Court sentenced her, Ms. Russell—despite 66 years of life—had never been involved in any criminal activity whatsoever (*see* PSR ¶¶ 42-44). She maintained an unblemished record in pretrial, presentence, and pre-surrender release (*see* PSR ¶ 6). And the government agreed that Ms. Russell played a minor role in this crime and that she was motivated and influenced by her son—who is currently serving an extremely lengthy prison sentence—to participate (*see* ECF No. 158 at 9). What's more, Ms. Russell has maintained a perfect disciplinary record in BOP custody, has consistently programmed (despite Dublin's limitations), the BOP classifies her as minimum risk, and she has received praise for how she has comported herself in custody (Ex. S; *see also* Ex. T). Ms. Russell's release poses no community danger.

## Conclusion

Ms. Russell respectfully asks that this Court reduce her sentence to time served.

s/ Miles Pope

Miles Pope

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

**Certificate of Service**

I certify that I served this motion on the government via CM/ECF filing on July 10, 2024.

/s Miles Pope
Miles Pope
Goddard Pope PLLC
*Counsel for Ms. Russell*