JOSHUA D. HURWIT, IDAHO STATE BAR NO. 9527
UNITED STATES ATTORNEY
CHRISTOPHER S. ATWOOD, IDAHO STATE BAR NO. 7013
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
1290 W. MYRTLE ST. SUITE 500
BOISE, ID 83702-7788
TELEPHONE: (208) 334-1211

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>LAURA DENISE RUSSELL,<br><br>　　　　　Defendant. | Case No. 1:21-cr-00158-DCN-002<br><br>**GOVERNMENT'S OPPOSITION TO MOTION FOR REDUCTION OF SENTENCE** |

The Court should deny Defendant's motion for compassionate release. Defendant failed to show her circumstances are extraordinary or compelling. In addition, and in the alternative, the Defendant cannot show that the § 3553(a) factors weigh in favor of release.

## BACKGROUND

Defendant Russell was involved in a serious and lengthy conspiracy to distribute drugs and launder drug proceeds. Because the leaders of the conspiracy were incarcerated in prison, Defendant Russell's participation was essential to the success of the conspiracy. Defendant Russell mailed contraband cell phones into the prison so that codefendants Michael Osborn and Troy Wheeler could direct others and facilitate the crimes. Defendant Russell participated in many other aspects of the criminal activity to help distribute drugs and launder the drug proceeds.

GOVERNMENT'S OPPOSITION TO MOTION FOR REDUCTION OF SENTENCE - 1

The conspiracy functioned as follows: (1) Defendant Russell purchased Bitcoin (a virtual currency) that could be used to purchase drugs on the internet, (2) codefendant Osborn, who was in prison, purchased drugs on the internet using a contraband cell phone that Defendant Russell sent him and the Bitcoin that Defendant Russell purchased, (3) the drugs were shipped through the mail from outside the country into Idaho, (4) Defendant Russell retrieved the drugs from the mailbox and distributed them to other members of the conspiracy who in turn sold the drugs; (5) Defendant Russell collected proceeds from the drug sales from other members of the conspiracy such as codefendant Klinkhamer, and (6) Defendant Russell laundered the drug proceeds by converting it back into Bitcoin to conceal the source, location, and ownership of the drug proceeds. This cycle would start all over again as codefendant Osborn would then use some of the Bitcoin drug proceeds to purchase additional drugs on the internet, which were sent in the mail to Idaho, that Defendant Russell would receive and distribute. This conspiracy continued in this manner for over a year.

Investigators discovered extensive evidence of Defendant Russell's participation in the lengthy conspiracy. For instance, they discovered that it was Defendant Russell who received and then distributed the drugs that were sent into Idaho. Although the drugs were sent to a mailbox in codefendant Klinkhamer's name, investigators discovered text messages showing that Defendant Russell took possession of the key, and control of the mailbox, immediately after the mailbox was rented.

| TEXT MESSAGES BETWEEN LAURA RUSSELL AND ANGELA KLINKHAMER |||
|---|---|---|
| December 26, 2019 |||
| Klinkhamer: | Hey **I am coming to Mountain Home to set up the PO box** where exactly do I go if you can give me an address that would be great | |
| Russell: | Coming today? | |
| Klinkhamer: | I am almost there | |
| Russell: | [screen capture image sent] |  |
| Russell: | [blank] | |
| Russell: | Ok. **Are you going to tell them you are moving here and need a place for mail**? | |
| Klinkhamer: | Sure | |
| Russell: | Ok. When u are finished, msg me, **I will come meet u to get the key** | |
| Klinkhamer: | I'm getting it right now | |
| Russell: | Ok. Are u almost finished? | |
| Klinkhamer: | Yes | |
| Russell: | Ok, I'll come meet u there | |

After Defendant Russell retrieved the drugs from the mailbox, there were text messages that showed she distributed the drugs to Klinkhamer and others.

| TEXT MESSAGES BETWEEN LAURA RUSSELL AND ANGELA KLINKHAMER ||
|---|---|
| March 27, 2020 ||
| Russell: | **Troy said you are coming today**. Let's meet at Albertsons |
| Klinkhamer: | At five right |
| Russell: | Yes |
| Klinkhamer: | Well I can't find a babysitter either so my girls are going to be with me so **if you're able to vacuum seal it That would probably be the best thing for me especially with cops pulling everybody over left and right** |
| Russell: | I can't vacuum seal it, I don't have one. |
| | I haven't heard anything about cops pulling ppl over, just the opposite, they are trying to not have contact with ppl |
| Klinkhamer: | Ok cool |
| Klinkhamer: | See u at 5 |

GOVERNMENT'S OPPOSITION TO MOTION FOR REDUCTION OF SENTENCE - 3

Investigators seized numerous communications showing Defendant Russell collected drug proceeds.



Codefendant Klinkhamer would deposit the drug proceeds into Defendant Russell's credit union account and send her Bitcoin.



Financial records confirm that Defendant Russell and codefendant Osborn received significant proceeds from the drug sales. Although Defendant Russell reported making only $25,805 in 2020 and $36,665 in 2019, from November 2019 through January 2021, deposits into her credit union account totaled over $110,000. Defendant Russell opened a credit union account for her son, codefendant Osborn, and she was an authorized signer for the account. From November 2019 through January 2021, when Osborn was in prison and did not hold a legitimate job, deposits into his account totaled over $135,000. Many of the deposits were from Venmo,

GOVERNMENT'S OPPOSITION TO MOTION FOR REDUCTION OF SENTENCE - 4

CashApp, or other similar payment services. The combined bank deposits for the two of them during the time of the conspiracy exceeded $246,000.

Records show that Defendant Russell made numerous Bitcoin transactions converting huge amounts of cash into Bitcoin. For example, she converted $65,570 into Bitcoin at a single kiosk in Boise. Investigators confirmed it was Defendant Russell making the transactions because the kiosk took photos of Russell conducting the transactions.

| Date | BTC Purchased | Cash Paid | Wallet |
|---|---|---|---|
| 1/12/21 | .0272 | $1,000 | 1MauL.... |
| 12/29/20 | .1994 | $5,700 | 16qzty.... |
| 12/28/20 | .3179 | $9,000 | 1Dqgy.... |
| 12/17/20 | .2513 | $6,000 | 1JnYV.... |
| 12/15/20 | .4391 | $9,000 | 1Pnta3.... |
| 8/13/20 | .3538 | $4,400 | 1M6YJ... |
| 8/10/20 | .16369 | $2,050 | 1M6YJ... |
| 8/6/20 | .7239 | $9,000 | 1M6YJ... |
| 8/5/20 | .7260 | $9,000 | 1M6YJ... |
| 6/9/20 | .8768 | $9,000 | 144JQ.... |
| 11/13/19 | .1542 | $1,420 | 1HWFd... |
| TOTAL | 4.233 | $65,570 | |





The conspiracy, which lasted over a year, involved significant amounts of drugs. During the first six months of the conspiracy, investigators seized six parcels that were addressed to the mailbox that contained approximately 3,329 grams of a-PHP, a schedule I controlled substance. There were other parcels containing a-PHP that were received at the mailbox and distributed by members of the conspiracy.

During the second part of the conspiracy, the a-PHP was shipped directly to Defendant Russell at her residence. Investigators again intercepted numerous mail parcels containing a-

GOVERNMENT'S OPPOSITION TO MOTION FOR REDUCTION OF SENTENCE - 5

PHP. In total, the amount of additional drugs seized in the packages sent directly to Defendant Russell's residence exceeded 1,800 grams of a-PHP.

Defendant Russell, who was nearly 65 years old and had no criminal history, was interviewed by investigators several times. She was uncooperative and continued to participate in criminal activity.  On July 10, 2020, investigators questioned Defendant Russell about the mailbox and asked about codefendant Klinkhamer. Defendant Russell pretended not to know Klinkhamer and claimed to not know anything about the mailbox that had been receiving the drugs. On August 19, 2020, investigators searched Defendant Russell's residence pursuant to a search warrant.  In her residence, they found a drug ledger, a digital scale, a Bitcoin receipt, and Bitcoin wallet passwords. Defendant Russell had been making so much money she also possessed a currency counting machine, which was seized by investigators along with approximately $19,343 in drug proceeds.

 

Another person, who was present in her residence, possessed approximately 50 grams of a-PHP, a digital scale, and small plastic baggies. Investigators asked to speak with Defendant Russell but she refused to speak with investigators.

The next day, Defendant Russell went to the credit union where she transferred $42,008 from codefendant Osborn's account into her own and then withdrew $20,000. She conducted

GOVERNMENT'S OPPOSITION TO MOTION FOR REDUCTION OF SENTENCE - 6

these financial transactions knowing the property was drug proceeds and intending to conceal the location of the drug proceeds from law enforcement.



In January 2021, investigators seized 7.83777659 Bitcoin in drug proceeds from a digital wallet pursuant to a court-authorized seizure warrant. The Bitcoin was valued at approximately $280,000 at the time of seizure. On March 29, 2021, Defendant Russell submitted an "Asset Claim Form" where claimed, under penalty of perjury, owner ship of the Bitcoin and claimed it was "removed under false allegation." Codefendant Osborn also made a claim to the Bitcoin.

A grand jury returned an indictment charging Defendant Russell and others with conspiring to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C),

GOVERNMENT'S OPPOSITION TO MOTION FOR REDUCTION OF SENTENCE - 7

and 846; and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956. (Docket No. 65). The indictment also included a forfeiture seeking forfeiture of the 7.83777659 BTC. *Id*. Defendant Russell later pleaded guilty to conspiracy to commit money laundering and agreed to forfeit the seized Bitcoin. (Docket No. 110). Because Defendant Russell committed the underlying criminal offense of conspiracy to distribute controlled substances, the base offense level of her advisory guideline range, pursuant to USSG § 2S1.1(a)(1), started at 30 because of the significant amount of drugs involved in the offense. (Docket No. 154, Presentence Report (PSR) ¶ 31). The PSR noted the guideline calculation was "an extremely conservative estimate of the amount of controlled substances involved in the instant offense" because it was based only on the drugs seized and did not include the other drugs that were distributed by the Defendant and others. *Id*. Her guidelines were increased by two levels because of her participation in the money laundering. *Id*. at ¶ 33.

Defendant Russell filed a number of frivolous objections to the PSR including claims that she was collecting drug proceeds only on behalf of codefendant Wheeler and not Osborn. (Docket No. 139). She also claimed that she believed the Bitcoin belonged to Wheeler and not her son Osborn. *Id*. She withdrew her frivolous objections after the Government responded and provided a recorded call where Defendant Russell cried during a phone call with Osborn as she told him the Bitcoin was taken and lamented, "how hard we worked to build this." (Docket No. 152). During the same call Osborn acknowledged that only he and Defendant Russell had access to the Bitcoin account. *Id*.

Defendant Russell received several favorable sentencing recommendations from the Government including a two-level reduction for a minor role in the offense[1] and the benefit of the Government's request for a significant downward variance of four levels in the sentencing guidelines. (Docket No. 110, p. 9). The downward variance was based in large part upon Defendant Russell's age and physical conditions such as Meniere's disease and vertigo. (Docket No. 158, p. 9). The significant variance requested by the Government reduced the guideline range by approximately 35%. *Id*. at p. 11. The Court accepted the Government's requests and sentenced the Defendant to a lenient 40 months of prison. (Docket No. 160). Although Defendant was supposed to surrender to the Bureau of Prison on July 20, 2023, she requested additional time to consult with her medical providers again. (Docket No. 163). The Court granted her request for an extension of seven weeks to voluntarily surrender. (Docket No. 164). She self-surrendered to the Bureau of Prisons on September 9, 2023, to begin her 40-month prison sentence. *Id*.

Within one month of reporting to prison, on October 9, 2023, Defendant Russell filed a request asking to be sent home from prison. (Docket No. 204-10, Defendant's Exhibit J). Her request was denied by the Bureau of Prisons because she is serving her prison sentence at a Federal Medical Center that is managing her medical conditions and her conditions do not constitute extraordinary and compelling reasons.

She is currently serving her sentence at Lexington Federal Medical Center, in Kentucky. Her projected release date is March 11, 2026. However, she is expected to be released to

---

[1] Although her participation was essential to the success of the conspiracy, she was substantially less culpable than Osborn and Wheeler, who both received increases for their leadership roles in the offense. Defendant Russell was also more culpable than codefendant Klinkhamer who received a three-level reduction for her minor role in the offense.

GOVERNMENT'S OPPOSITION TO MOTION FOR REDUCTION OF SENTENCE - 9

community confinement as early as March 2025 and is eligible for home confinement in December 2025.

The Court should deny her motion because she has not, and cannot, satisfy the high burden for the unusual and extreme remedy she seeks.

## DISCUSSION

**I.   This Court should deny the Defendant's Motion because there are no extraordinary and compelling reasons to release her.**

"A federal court generally 'may not modify a term of imprisonment once it has been imposed.'" *Dillon v. United States*, 560 U.S. 817, 819 (2010) (quoting 18 U.S.C. § 3582(c)). Congress provided an exception to this general rule in 18 U.S.C. § 3582(c), commonly referred to as compassionate release. It amended that statute to allow defendants to file motions themselves, instead of merely allowing the Bureau of Prisons to do so. *See United States v. Aruda*, 993 F.3d 797, 800 (9th Cir. 2021). Accordingly, a federal district court may now reduce a sentence under § 3582(c) upon the motion of a defendant if, "after considering the factors set forth in section § 3553(a) to the extent they are applicable," the court finds that:

(1) (A)  extraordinary and compelling reasons warrant the reduction; or

…

(2)  the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

USSG § 1B1.13. (as amended).[2] The amendments to § 1B1.13, which comport with the First Step Act, provide guidance as to what constitutes extraordinary and compelling reasons. The

---

[2]   The U.S. Sentencing Commission approved amendments to USSG § 1B1.13 that took effect November 1, 2023.

GOVERNMENT'S OPPOSITION TO MOTION FOR REDUCTION OF SENTENCE - 10

amendment expanded the list of specified extraordinary and compelling reasons. For medical circumstances, the guideline limits relief to cases where:

(A) The defendant is suffering from a terminal illness …;

(B) The defendant is –

    a. suffering from a serious physical or medical condition,

    b. suffering from a serious functional or cognitive impairment, or

    c. experiencing deteriorating physical or mental health because of the aging process,

*that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover*;

(C) The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death;

(D) [circumstances involving an infectious disease outbreak]

USSG § 1B1.13 (emphasis added).

Defendant Russell has not shown extraordinary or compelling medical reasons. Her claims that BOP has mismanaged her Meniere's disease and vertigo are not substantiated. Defendant Russell is being held at a Federal Medical Center and she is receiving adequate care. Since she was transferred to the Medical Center, she is scheduled to be seen by a specialist for their evaluation. (See Government's Exhibit #1). Although she believes she should be on different medication, she has failed to meet the heavy burden of showing that her medical condition diminishes her ability to provide self-care or from which she is not expected to recover.

GOVERNMENT'S OPPOSITION TO MOTION FOR REDUCTION OF SENTENCE - 11

Next, § 1B1.13, provides physical abuse committed by a correctional officer may constitute extraordinary and compelling reasons if the physical abuse results in "serious bodily injury," as defined in the Commentary to §1B1.1. "Serious bodily injury" means injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation. More importantly, "[f]or purposes of this provision, the misconduct must be established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding, unless such proceedings are unduly delayed or the defendant is in imminent danger." USSG § 1B1.13(b)(4).

Defendant's claim of physical abuse fails to meet the required standard for several reasons. First, the misconduct Defendant Russell alleges has not been established by criminal conviction, civil liability, or administrative proceeding as required by § 1B1.13(b)(4). Her allegation of misconduct has not been established at all. It is a mere allegation that even by Defendant's version of events was an accident and not an assault. It also does not constitute serious bodily injury. She had an Xray of her elbow in November 2023 with unremarkable finding.

Defendant's other arguments fail to rise to extraordinary and compelling reasons. For example, she complains that she was placed in handcuffs while in custody. It is hardly unusual for an inmate in a custodial setting to be secured in handcuffs while in transit. She complains that instead of being housed in Dublin, California, she is now housed at a Federal Medical Center in Lexington, Kentucky. It is true that it is further from her residence. However, that circumstance alone, or in combination with her other complaints hardly amounts to extraordinary and compelling reasons for release. One of the reasons she was transferred to Lexington, Kentucky is

GOVERNMENT'S OPPOSITION TO MOTION FOR REDUCTION OF SENTENCE - 12

to be at the Federal Medical Center to receive treatment for the medical conditions that she complains about. Defendant Russell has failed to meet her burden of showing extraordinary and compelling reasons for release. She has not satisfied the burden of the extreme remedy she seeks. The Court should deny her motion on that basis.

**II.  The Defendant has also not shown that the § 3553(a) factors weigh in favor of release.**

Even if the Defendant met her burden of proving extraordinary and compelling reasons, which she has not, the § 3553(a) factors do not support release. This is an independent and alternative reason to deny Defendant's motion.

Defendant Russell participated in a serious and lengthy criminal conspiracy. Her participation was essential to the success of the conspiracy. She had numerous opportunities to withdraw from the conspiracy. Even when questioned by investigators she continued her participation in the conspiracy. The Government and the Court already considered the Defendant's history and characteristics at the time of sentencing. She received a downward variance below the guidelines because of her lack of criminal history and medical conditions. The Court showed extreme leniency at the time of sentencing and the § 3553(a) factors supported the 40-month prison sentence the Court originally imposed. The Defendant, who has spent less than a year of imprisonment, now asks the Court to use the same reasons already considered to lower her sentence even further. The nature and circumstances of the offense warrant a 40-month sentence. Protection of the community and deterrence to Defendant also justify the Court's 40-month sentence.

//

//

//

GOVERNMENT'S OPPOSITION TO MOTION FOR REDUCTION OF SENTENCE - 13

## CONCLUSION

This Court should deny Defendant's motion because she failed to show extraordinary and compelling circumstances and because the § 3553(a) factors weigh against her release.

Respectfully submitted this 15th day of August, 2024.

JOSHUA D. HURWIT
UNITED STATES ATTORNEY
By:

*/s/ Christopher S. Atwood*
CHRISTOPHER S. ATWOOD
Assistant United States Attorney