UNITED STATES DISTRICT COURT
FOR THE DISRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:21-CR-158-DCN |
| | ) | |
| v. | ) | Reply in support of Ms. Russell's |
| | ) | sentence-reduction motion |
| | ) | |
| LAURA DENISE RUSSELL | ) | |

**Argument**

The government's response brief consists overwhelmingly of a recital of the facts of Ms. Russell's underlying criminal case. Some of the facts the government recites—such as its reference to "frivolous PSR objections" submitted, but later withdrawn, by Ms. Russell's defense lawyer—are simply not valid considerations in determining the appropriateness of Ms. Russell's sentence (ECF No. 210 at 8). As for the other sentencing facts, this Court already appropriately took those into account when it fashioned Ms. Russell's sentence.

That's why Ms. Russell's sentence-reduction motion focuses on new facts—facts that, as is fitting in a "second-look"[1] motion, *change the calculus* of how much time Ms. Russell should remain in BOP custody. In contrast to its lengthy discussion of the underlying criminal case, the government's opposition papers don't

---

[1] *See, e.g.*, Michael T. Hamilton, *Opening the Safety Valve: A Second Look at Compassionate Release Under the First Step Act*, 90 Fordham L. Rev. 1743, 1751 (2023) (noting that § 3582(c)(1)(A) was originally enacted to serve as a substitute "second look" mechanism after Congress abolished federal parole).

Reply in Support of Ms. Russell's Sentence-Reduction Motion
– 1 –

spend much time on these new facts. Most of what it says about them is conclusory. And the rest—such as its erroneous claim that Ms. Russell has been placed in a Federal Medical Center and is receiving specialty care at such a facility—is simply false.

As this reply explains, the bottom line in Ms. Russell's case is that—as competent medical evidence (including a doctor's specific evaluation of her condition) reflects—Ms. Russell's serious medical conditions are being mismanaged in BOP custody; she was the victim of the extraordinary circumstances at FCI Dublin, including a prison assault that this Court may validly consider under USSG § 1B1.13; and despite all of this, she has comported herself so well in BOP custody that her BOP counselor has singled her out for praise, noting that she makes "good use of her time" in custody and "has demonstrated an above-average readiness for reentry into society" (ECF No. 204, Ex. S at 3).

These circumstances abundantly justify reducing Ms. Russell's sentence to time served, which, given the time credits she has amassed in custody, would result in a mere 6-month reduction in her term of incarceration as compared to when she is eligible for early release (*see* ECF No. 210 at 10 (acknowledging Ms. Russell's eligibility date)). Given what she has experienced, and the medical mismanagement she continues to endure, that modest reduction in Ms. Russell's sentence is well worth protecting her from further serious medical risk.

## A. The BOP's mismanagement of Ms. Russell's medical condition establishes extraordinary and compelling reasons for her release.

Ms. Russell's sentence-reduction motion provided this Court with medical evaluations and analysis prepared by two of Ms. Russell's doctors—Dr. Amy Schell and Dr. Eric Wilkinson—alongside abundant citations to peer-reviewed, published medical literature (*see* ECF No. 204 at 2-4, 14-16). As Ms. Russell explained in her motion, the upshot of these materials is that:

- Ms. Russell has inadequately treated osteoporosis, which was not even diagnosed until after this Court sentenced her (*id.* at 2-4);
- She has improperly treated Meniere's disease (ECF No. 204, Ex. B ("[Ms. Russell] is unable to access Betahistine and as such is not on adequate medical treatment of her Meniere's Disease")); and
- The combination of these two conditions "puts her at elevated risk of vertigo episodes that could result in falls and further injuries" (*id.*).

Notably, the government's opposition does not contest that *if* Ms. Russell's medical conditions are being mismanaged by the BOP *then* she establishes extraordinary and compelling reasons for release (*cf.* ECF No. 210 at 11). Instead, the government baldly asserts, without any evidence or analysis, that "[Ms. Russell's] claims that BOP has mismanaged her Meniere's disease and vertigo are not substantiated" (*id.*). It says—falsely—that she is now being held "at a Federal Medical Center" (*id.*). And it further says—also falsely— that Ms. Russell is "scheduled to be seen by a specialist for their evaluation" of her Meniere's (*id.*).

The government's response fails. Its bald assertion that the medical evidence Ms. Russell placed before this Court in her motion does not "substantiate[]" her medical claims is conclusory say-so backed up by no case law or analysis.

Its next claim—that Ms. Russell is now housed at a Federal Medical Center—is highly misleading. It is true that Ms. Russell is housed at the FMC Lexington complex. But she is *not* at the Federal Medical Center—she is at an adjacent women's satellite camp. Ms. Russell attaches to this reply an email received from the Executive Assistant to the Warden of FMC Lexington, which decisively rejects the government's representation to this Court that Ms. Russell is housed in a BOP medical center, noting that "the Camp is not a medical center," that FMC Lexington is not "a medical center for the female adults in custody," and that women at the facility are to be taken to a local outside hospital for needed care (just like at any other nonmedical BOP facility):

> **Miles Pope**
>
> **From:** LEX-ExecAssistant-S (BOP) <LEX-ExecAssistant-S@bop.gov>
> **Sent:** Friday, August 16, 2024 7:12 PM
> **To:** Miles Pope
> **Subject:** Russell, Laura
>
> Good evening. I was asked to clarify the confusion concerning FMC Lexington being a medical center for the female adults in custody. The females do have access to medical and are taken to the University of Kentucky for necessary and required appointments. The Camp is not a medical center, only the FMC is an Administrative facility which houses male adults in custody. Please let me know if you have any questions.
>
> Ms. Ely

(See Ex. RA). In light of this, the government's representation to this Court that "[o]ne of the reasons [Ms. Russell] was transferred to Lexington, Kentucky is to be at the Federal Medical Center to receive treatment for the medical conditions that she complains about" is simply not true (ECF No. 210 at 12-13). It is telling that—in the face of Ms. Russell's serious medical problems—the government assumed that

Ms. Russell was being housed within an FMC. But that assumption and associated representations to this Court are simply false.

Finally, the government's argument that the BOP's continuous failure to properly manage Ms. Russell's Meniere's disease doesn't constitute extraordinary and compelling circumstances because she was belatedly—after months in custody—"scheduled to be seen by a specialist for their evaluation" of her Meniere's Disease also fails (ECF No. 204 at 11).

At the outset, it is worth noting that it was not until they were under the shadow of a § 3582(c)(1)(A) motion that the BOP even considered initiating the process of giving Ms. Russell appropriate access to medical specialists. The government would have this Court ignore the massive failure of medical care that Ms. Russell experienced at FCI Dublin where, as a recent Special Master's Report on that facility explained, "[p]atients" simply "were not provided timely access to care." First Report of the Special Master Pursuant to the Court's Order of March 26, 2024 at 7, *Dublin Prison Case*, Case No. 4:23-cv-4155-YGR.

The government's argument also rests on a mischaracterization of the BOP Health Services' Clinical Encounter Note on which it is based, which "*[r]ecommend[s] having her scheduled* to see [a] neuro-otology specialist" to evaluate Ms. Russell's Meniere's Disease but doesn't state that any evaluation is actually on the books (ECF No. 210, Ex. A (emphasis added)).

Most fundamentally, the Clinical Encounter Note ultimately supports, rather than undermines, Ms. Russell's claim that the BOP's mismanagement of her

Meniere's Disease places her "at risk of serious deterioration in health." USSG § 1B1.13(b)(1)(C). That's because the Clinical Encounter Note *confirms* that Betahistine "is not currently available at her new" BOP facility (*id.*). And, underscoring that the BOP simply doesn't have the options available to treat Ms. Russell's Meniere's, the note goes on to recommend, as the only alternative treatment for her Meniere's Disease, that Ms. Russell be placed on diuretics if she can tolerate them. But as Dr. Wilkinson has already explained—in a letter predating this Clinical Encounter Note—"Ms. Russell [has been] treated with diuretics [in the past] but did not tolerate them" (ECF No. 204, Ex. B).

The evidence before this Court uniformly establishes that Ms. Russell's Meniere's disease is being mismanaged—a situation that, especially considered in tandem with her osteoporosis, poses an unacceptable risk of serious deterioration in Ms. Russell's health.

### B. Ms. Russell's experiences in connection with FCI Dublin justify a 6-month reduction in her sentence.

In addition to her medical mistreatment, Ms. Russell also moved for a reduction in sentence based on her experiences while housed at FCI Dublin and during the aftermath of its closure. Among other things, Ms. Russell endured an assault and retaliation from a correctional officer who slammed her elbow with a door and then, when she reported that misconduct, retaliated against her (ECF No. 204 at 5-6). She was traumatized by the BOP's precipitous decision to close FCI Dublin and what numerous senators on the Senate Judiciary Committee described

as "chaos"[2] in connection with what Judge Gonzalez Rogers called the BOP's "ill-conceived"[3] approach to transferring every single woman at FCI Dublin to another BOP location—often (as in Ms. Russell's case) thousands of miles from their home. As Judge Gonzalez Rogers put it, what Ms. Russell endured at FCI Dublin, and in the aftermath of its closure, was "harder time" than what she would have experienced elsewhere.[4] These extraordinary circumstances justify the modest sentence reduction Ms. Russell requests.

In its opposition, the government seeks to minimize the extraordinary nature of these experiences. It characterizes Office Mangra's decision to repetitively slam a door into Ms. Russell's arm—and then to retaliate against her after she reported the misconduct—as "a mere allegation" and just "an accident," ignoring the medical evidence and corroborated witness statements Ms. Russell put before the Court (ECF No. 210 at 12). It says that the assault did not result in serious bodily injury because "an Xray of [Ms. Russell's] elbow in November 2023" did not reveal any injury, ignoring the fact that the "protracted impairment" Ms. Russell has been experiencing—ulnar nerve damage—cannot be seen by X-ray (*id.*). It characterizes what Ms. Russell endured during her gratuitous and "ill-conceived" transfer from FCI Dublin to the Lexington, Kentucky satellite camp—her repeated strip searches

---

[2] Sens. Booker, Durbin, et al., *Letter to BOP re FCI Dublin* (Apr. 24, 2024).

[3] *Dublin Prison Case*, 4:23-cv-4155, ECF No. 300 at 1.

[4] *Id.* at ECF No. 301-3.

(*see* ECF No. 204 at 2, 10, 18) and her being shackled to the point that bruising was visible to medical personnel at Lexington (*see id.* at Ex. N & I) as "hardly unusual" (ECF No. 210 at 12). And it falsely suggests that the BOP's decision to transfer Ms. Russell to a facility thousands of miles from her home was motivated by a desire to provide Ms. Russell with adequate medical care, when it was, in fact, driven by the BOP's having let one of its facilities become so profoundly dangerous and dysfunctional that a judge needed to intervene in its management, at which point the BOP elected to shut it down instead of submitting to true judicial oversight.

This Court can and should find that the assault and retaliation Ms. Russell endured at FCI Dublin constitutes extraordinary and compelling reasons to reduce her sentence under USSG § 1B1.13(b)(4)(B). Officer Mangra's, at minimum, reckless decision to repeatedly slam a door into Ms. Russell's elbow is corroborated (ECF No. 204 at Exs. C, H). *See Jones v. U.S.*, 36 F.4th 974, 980 (9th Cir. 2022) (federal assault can be committed recklessly). Ulnar nerve damage constitutes serious bodily injury (Exs. I, Q, R). And as for the government's argument that § 1B1.13(b)(4)(B) disables the Court from considering an assault until Office Mangra's misconduct is established in a collateral proceeding—the BOP's decision to close FCI Dublin, thereby disrupting any possible administrative proceedings, is a clear case of undue delay authorizing this Court to grant a reduction in sentence on this basis. *See* USSG § 1B1.13(b)(4)(B).

In any event, the Court can and should also find that the totality of circumstances in Ms. Russell's case justifies the modest sentence reduction she

requests. In its opposition, the government mischaracterizes § 3582(c)(1)(A)—a bipartisan provision signed into law by President Trump—as an "extreme" remedy (ECF No. 210 at 13). In fact, what is extreme about this case is not the remedy Ms. Russell seeks, but the circumstances she has had to endure. FCI Dublin's mismanagement of Ms. Russell's medical conditions—and the ongoing deficient medical care at Lexington—was and is extreme. The assault and retaliation Ms. Russell endured at Dublin—part of a well-documented pattern of abusive behavior by correctional officers at that facility—was extreme. The precipitous decision to close FCI Dublin, and what it subjected Ms. Russell to, was extreme. In comparison, Ms. Russell's sentence-reduction motion—which asks that a 65-year-old with no prior record and serious medical problems be allowed to return to her loving husband approximately 6 months before what would otherwise be her eligibility for early release—is a modest, proportionate request. The Court should grant it.

### C. The § 3553(a) factors support the modest sentence-reduction Ms. Russell requests.

Finally, the § 3553(a) factors support Ms. Russell's sentence-reduction motion. When it originally sentenced Ms. Russell, this Court took into account every single fact about Ms. Russell's underlying crime and then-current circumstances that the government's opposition motion rehashes, and it appropriately fashioned a sentence that was rooted—not in the "extreme leniency" that the government accuses the Court of—but in the law. It thus imposed a sentence rooted in § 3553(a)'s mandate that all federal sentences must be "sufficient, but no greater than necessary."

Circumstances have now changed. When the Court sentenced Ms. Russell, it took some (but not all[5]) of her medical circumstances into account. But it could not have known that the BOP would fail to properly treat Ms. Russell's Meniere's disease or that the combination of the BOP's mistreatment and Ms. Russell's osteoporosis would place her at the substantial risk of serious injury that a vertigo-induced fall would present. When the Court sentenced Ms. Russell, it could not have known that FCI Dublin was the "dysfunctional mess" that it has proven to be, nor that Ms. Russell would have to endure medical neglect and physical assault at that facility—nor the traumatizing aftermath of its precipitous closure. And when the Court sentenced Ms. Russell, it did not have at its disposal the full record of her exemplary conduct in prison that it now has, including the BOP's assessment that she exhibits an "above-average readiness" for reentry into society and that she has made "good use" of her time in custody (ECF No. 204 at Ex. S).

These are new facts, entirely mitigating, and they support reducing Ms. Russell's sentence to credit for time served.

## Conclusion

For the reasons stated here and in her underlying motion, Ms. Russell respectfully asks the Court to grant her request for a reduction in sentence.

s/ Miles Pope
Miles Pope

---

[5] Ms. Russell was not diagnosed with osteoporosis until after sentencing (*see* ECF No. 204 at Ex. A).

**Certificate of Service**

I certify that I served this motion on the government via CM/ECF filing on August 22, 2024

/s Miles Pope
Miles Pope
*Counsel for Ms. Russell*
